DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Supreme Foodservice GmbH | ) | ASBCA No. 60309 |
| | ) | |
| Under Contract No. SPM300-05-D-3130 | ) | |

APPEARANCES FOR THE APPELLANT:        John R. Prairie, Esq.
                                      J. Ryan Frazee, Esq.
                                      Bryan T. Bunting, Esq.
                                      Sarah B. Hansen, Esq.
                                      Jennifer Eve Retener, Esq.
                                        Wiley Rein LLP
                                        Washington, DC


APPEARANCES FOR THE GOVERNMENT:       Daniel K. Poling, Esq.
                                        DLA Chief Trial Attorney
                                      Kelly L. Diaz-Albertini, Esq.
                                      Lindsay A. Salamon, Esq.
                                      Anne P. Steel, Esq.
                                      Ryan P. Hallisey, Esq.
                                      Stacey E. Hirsch, Esq.
                                      Robert L. Kieffer, Esq.
                                      Lindsey R. Mossor, Esq.
                                        Trial Attorneys
                                        DLA Troop Support
                                        Philadelphia, PA


OPINION BY ADMINISTRATIVE JUDGE O'CONNELL
ON APPELLANT'S MOTION FOR JUDGMENT ON THE
PLEADINGS OR FOR SUMMARY JUDGMENT

Appellant, Supreme Foodservice GmbH (Supreme) moves for judgment on the pleadings or, in the alternative, for summary judgment, contending that the government has no right to recover any funds from Supreme notwithstanding Supreme's disclosure of bid rigging by a former employee. The Board denies the motion.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

1.  This contract has been the subject of extensive litigation between the parties, including 47 appeals dating back to December 2011.  The Board and the Federal Circuit have issued a total of 10 published decisions.

2.  In 2019, the Board conducted a one-month hearing on Supreme's claims related to Premium Outbound Transportation.  *Supreme Foodservice GmbH*, ASBCA No. 57884, *et al.*, 20-1 BCA ¶ 37,618 (*Supreme I*), aff'd *Supreme Foodservice GmbH v. Dir. of the Def. Logistics Agency*, 54 F.4th 1362 (Fed. Cir. 2022).  Our decision in *Supreme I* contains extensive findings of fact, some of which are relevant to the present appeal, including those facts relating to the pricing of food and Supreme's history of fraud.

3.  These appeals arise from a June 3, 2005, commercial items contract to furnish and deliver food, including fresh fruits and vegetables, in Afghanistan. *Supreme I* at findings 1, 22, 193 (R4, tab 1[1] at 13, 23).  DLA paid Supreme based on a Unit Price that had two components:  the Delivered Price, which was the supplier's "actual invoice price" to deliver the food to Supreme, and the Distribution Fee, which contained all other costs, including general and administrative expenses, overhead, profit, packaging, and the cost of transport.  *Supreme I* at findings 24, 156 (R4, tab 1 at 19-20).

4.  Military customers placed their food orders through DLA's online catalog, in which Supreme listed its prices.  The contract allowed Supreme to change the prices once every two weeks.  (R4, tab 1 at 20-21, 34-35)

5.  With respect to monitoring the continuing reasonableness of prices, the contract provided:

> a.  A firm receiving an award under this pricing arrangement will be subject to price verification techniques such as market basket analysis and random price and invoice analysis. The distribution prices for the item categories as well as the delivered prices for items in each zone's market basket . . . will be analyzed extensively to ensure the pricing for all items is <u>fair and reasonable</u>. In summary, the pricing strategy for this acquisition has been formulated to ensure that:

---

[1] R4, tab 1, is the solicitation.  The contract incorporated the solicitation (R4, tab 6 at 1-2).  Citations are to the .pdf page number of the electronic file.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

      (i)  A flexible pricing provision should facilitate the establishment of a long-term partnership which allows for <u>price adjustment based on market factors</u>;

      (ii)  The offerors' procurement/pricing process is being evaluated to ascertain that market <u>pricing</u> provided to the Government is <u>at the most favorable terms</u>;

      (iii)  An ongoing post award review based on the plan submitted by the successful offeror will be conducted to verify that we [DLA] continue to receive <u>market pricing</u> during contract performance.

(R4, tab 1 at 23) (emphasis added)

6.  On February 9, 2006, after Supreme had begun performing, DLA issued a memorandum that required Supreme "to submit a valid manufacturer's invoice pertaining to any item that either increases or decreases in delivered price by 5% in the proposed update, or either increases or decreases by 10% in total price" (app. mot. at ex. 2).  The contracting officer (CO) would then decide whether to accept the price change (*id.*).  Supreme complied with this directive (*see* compl., ex. A., encl. 1 at 23-24).

7.  Supreme's initial supplier for a variety of items including fresh fruits and vegetables was Barakat Vegetables & Fruits Co. (Barakat) (*Supreme I* at finding 193).

8.  Supreme states, and DLA does not dispute, that in February 2010, after more than four years of performance, DLA approved a second supplier, the Fresh Fruits Company (FFC) (app. mot. at 3).

9.  Both parties cite a May 23, 2012 supplemental disclosure that Supreme submitted to the Department of Defense Inspector General (compl., ex. A, encl. 1 (the "suppl. discl.")).  (This document at page 2 cites an initial disclosure by Supreme to a DLA employee by email on April 10, 2011, but the parties have not provided this email to the Board).

10.  The supplemental disclosure describes "an apparent scheme by [Christoffel Vos, a former Supreme purchasing manager] to corrupt the Company's competition for supply of Fresh Fruits and Vegetables . . . ." (suppl. discl. at 3).  Supreme stated that Mr. Vos had manipulated the monthly price competitions between the two suppliers by sharing FFC's prices with Barakat (*id.* at 4).  Supreme found that "Mr. Vos defrauded the Company by colluding with Barakat's representative and rigging prices" (*id.* at 13).  Supreme reported the matter to the authorities in the United

3

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Arab Emirates (UAE), accusing Mr. Vos of committing larceny, fraud, breach of trust, concealment of crimes, and fraud in commercial transactions, as those offenses are defined under the UAE Penal Code (*id.* at 5).

11. Supreme stated in the supplemental disclosure that it had retained the accounting firm Ernst & Young (EY) "for the purpose of helping to determine possible damage to the Company" and to determine if it was appropriate to offer the government restitution (suppl. discl. at 6). Supreme (or EY) learned that Mr. Vos had a "lavish lifestyle" but stated that, while there were plausible reasons to believe that he had received kickbacks, it found no "specific evidence of kickbacks"[2] (*id.* at 5, 8).

12. Supreme stated that Mr. Vos solicited prices from FFC and Barakat each month and was supposed to award to the supplier that provided the best value to the government (suppl. discl. at 10-11). Although prices from the companies were due at the same time (*id.* at 10), Supreme discovered that Barakat regularly submitted its prices after FFC (*id.* at 11). Further, on numerous occasions Mr. Vos placed telephone calls to Barakat within minutes or hours of receiving FFC's prices but before Barakat submitted its prices (*id.* at 11). Between March 2010 and April 2011, Barakat won 95% of the fresh fruits and vegetable awards (*id.* at 13). After Supreme terminated Mr. Vos and established better controls, Barakat's award percentage dropped to 55%. (*id.* at 15).

13. EY performed an analysis and developed an "upper range of total potential damage" to the government of $2.736 million (suppl. discl. at 27). EY's analysis was based on the idea that price alone does not determine the best value of a food item and that, for example, some countries have better products of specific fruit than others (*id.* at 22). As a result, EY set out only to identify instances where Mr. Vos awarded the sale to Barakat when Barakat's price was higher, and the item came from the same country or region (*id.* at 25).

14. EY discovered, for example, that in March 2010, both Barakat and FFC proposed to deliver avocados from Thailand. Even though FFC's price was significantly lower at $2.72 per pound compared to $3.25 for Barakat, Mr. Vos awarded the delivery to Barakat (*id.* at 26). While almost all of EY's "upper range" calculation came from instances similar to that, EY also discovered some instances where Barakat initially proposed a lower price than FFC but then increased its final

---

[2] The report states that Supreme examined Mr. Vos's company issued laptop and phone but does not state, and there is no reason to believe, that Supreme had access to Mr. Vos's personally owned devices or his banking or other financial records (*id.* at 9). The report does not state what led Supreme to conclude that Mr. Vos had a lavish lifestyle or how his lifestyle differed from what a reasonable person could have afforded based on his salary at Supreme.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

prices "nearer to, but not in excess of, the prices FFC proposed, apparently as a result of learning FFC's proposed prices from Mr. Vos" (*id.* at 27).

15. Supreme offered DLA "restitution" of $1.566 million (*id.* at 6).

16. DLA requested assistance from the Defense Contract Audit Agency (DCAA), which issued a report dated May 30, 2013 (compl., ex. A, encl. 2). The report challenged several of EY's assumptions and calculated an audit adjusted amount of $4,984,096 (*id.* at 5). DCAA's largest criticism of EY was that, as described above (SOF ¶ 13), EY eliminated from consideration instances where Mr. Vos awarded a delivery to Barakat despite its higher price simply because Barakat proposed a product from a different country than FFC (compl., ex. A, encl. 2 at 9). DCAA questioned this because it stated that there was no evidence that Supreme did, in fact, buy higher quality products that would justify a premium price. Moreover, DCAA found evidence that when Barakat was the only company to offer products from Holland or Australia it received the award but that when FFC was the only company to offer products from Holland or Australia FFC did not receive the award (*id.* at 10).

17. On October 14, 2015, CO Lourdes Valentin issued a final decision, citing Supreme's supplemental disclosure and the DCAA report, and demanding $4,984,096 from Supreme (app. mot. at ex. 6).

18. Supreme filed a timely appeal on November 3, 2015. DLA filed a complaint containing three counts: breach of contract, breach of the duty of good faith and fair dealing, and restitution.[3]

## DECISION

### I.     Standard of Review

In a motion for judgment on the pleadings, the Board applies the same standard as in a motion for failure to state a claim. *Unitech Servs. Grp., Inc.*, ASBCA No. 56482, 10-1 BCA ¶ 34,362 at 169,695. In considering a motion to dismiss for failure to state a claim, the Board "may consider judicially noticeable matters outside the pleadings without converting [the] motion into one for summary judgment." *CODA Dev. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350, 1360 (Fed. Cir. 2019) (citing *Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999), *overruled on other grounds by Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002)). In *Jackson*, the Sixth Circuit stated that consideration of documents outside the pleadings

---

[3] When, as is the case here, the appeal involves a government claim, the Board often requires the government to file the complaint.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

generally requires conversion of the motion to one for summary judgment.  The Court noted that there are exceptions to this rule, including that documents "attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the plaintiff's claim." *Jackson*, 194 F.3d at 745 (citing *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997)).  Further, a tribunal may "consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies." *Id.* (citations omitted).

DLA's complaint cites, and includes as attachments, the CO's final decision, Supreme's supplemental disclosure, and the DCAA report.  Supreme's motion includes as an attachment relevant excerpts from the contract, the supplemental disclosure, and the CO's final decision.  The contract, Supreme's supplemental disclosure, the DCAA report, and the CO's final decision are all integral to DLA's claim.  There is no dispute about their authenticity by either party, and neither party has objected to their consideration in this motion.  Accordingly, the Board may consider them in deciding Supreme's motion for judgment on the pleadings.

II.    DLA's Complaint States a Claim Upon Which Relief May Be Granted

"A breach of contract claim requires two components:  (1) an obligation or duty arising out of the contract and (2) factual allegations sufficient to support the conclusion that there has been a breach of the identified contractual duty." *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014) (citing *Hercules, Inc. v. United States*, 24 F.3d 188, 198 (Fed.Cir.1994); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir.1989)).  When the language of the contract is clear and unambiguous, it must be given its plain and ordinary meaning. *Id.* at 1331.  The contract must be construed as a whole and "in a manner that gives meaning to all its provisions and makes sense." *Id.* (quoting *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996)).

"When interpreting the contract, the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004) (citing *McAbee*, 97 F.3d at 1434–35).  "An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id.* (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

A.  DLA Has Pled Actionable Harms

Supreme accused its former purchasing manager, Mr. Vos, of "colluding" with Barakat and "rigging prices."  Supreme reported him to UAE authorities for committing various crimes.  (SOF ¶ 10)  We expect that Supreme would not make

6

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

such accusations, nor would it go to the expense of hiring EY, nor would it have sent a letter to DLA suggesting millions of dollars in damages, if it did not believe that Mr. Vos had committed serious misconduct. The reason why Supreme made the disclosure seems obvious: because DLA reimbursed Supreme for the Delivered Prices, DLA would have been harmed by any inflated costs. Thus, it is rather jarring to read Supreme's motion to dismiss, in which Supreme contends that DLA suffered no actionable harm. In its reply brief, Supreme goes even further, making the dubious assertion that "the nature of Mr. Vos's actions has the general effect of lowering prices to undercut competition" (app. reply at 6).

We read the provisions of the contract cited above in SOF ¶ 5 as requiring Supreme to provide "fair and reasonable" prices. The provisions for continuing post-award verifications that the prices remain advantageous to the government and comply with market-based rates are only sensible in this context. Moreover, as described above, the contract provided that Supreme could charge DLA a Delivered Price, which was the "actual invoice price" from the supplier (SOF ¶ 3). We do not believe that the term, 'actual invoice price' embraces invoices that are the product of fraud, such as bid ridding or kickbacks, and, in any event, we could certainly find that the government's reasonable contract-based expectation was that when Supreme submitted an invoice, that invoice would not be one that was so tainted. Billing DLA with rigged prices would be a breach.

Further, Supreme agreed that it would be subject to post-award scrutiny by DLA to ensure, among other things, that "pricing for all items is fair and reasonable," that pricing "is at the most favorable terms," and that DLA would "continue to receive market pricing during contract performance" (SOF ¶ 5). For purposes of a motion to dismiss for failure to state a claim, we believe that it is reasonable to conclude that a rigged price is not a price "at the most favorable terms" or a "fair and reasonable" price. *See Anaheim Gardens v. United States*, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006) (in a motion to dismiss for failure to state a claim, the tribunal assumes well-pled factual allegations are true and makes reasonable inferences in favor of the nonmovant) (quoting *Gould,* 935 F.2d at 1274).

In addition, the contract provided that post-award DLA could conduct "market basket analysis and random price and invoice analysis" (SOF ¶ 5). Supreme has disclosed Mr. Vos's "corrupt" relationship with Barrakat and has disclosed that when both Barakat and FFC offered comparable products, he awarded the delivery to Barakat despite its higher prices due to his relationship with Barakat (SOF ¶ 12). That Supreme, and Mr. Vos, escaped DLA's scrutiny at the time is not the end of the matter. We see no reason why DLA cannot analyze the prices after the deliveries were made to ensure that it received pricing that was fair and reasonable and at the most favorable terms.

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

Supreme's supplemental disclosure, which is cited and attached to DLA's complaint, provides compelling evidence that Supreme breached the contract because its purchasing manager undertook a number of acts directly contrary to obtaining reasonable prices such as:  1) failing to engage in arms-length bargaining with Barakat; 2) rigging prices and possibly accepting kickbacks; 3) deviating from Supreme's standard practice of purchasing the product that was the best value for the government; 4) disclosing confidential information from a bidder to a competitor; 5) repeatedly failing to select the lowest offeror; and 6) concealing his actions (SOF ¶¶ 10-14).  Supreme's supplemental disclosure is also persuasive evidence that Supreme violated the duty of good faith and fair dealing because it deprived DLA of its reasonable expectation of fair and reasonable market pricing.  *Dobyns v. United States*, 915 F.3d 733, 739 (Fed. Cir. 2019).

Supreme bases its motion on several contentions, all of which ignore its contractual duty to obtain reasonable prices for the government and the effects that price fixing and potential kickbacks have upon that pricing.  It states that:  for the first several years of performance, Barakat was the exclusive supplier; Supreme was not obligated to bring FFC into the contract; and there was no contractual provision that required Supreme to compete the monthly awards to a supplier other than Barakat or to find the lowest possible price every month (app. mot. at 7; app. reply at 1-2).  Supreme also contends that DLA fails to allege that any specific fruits and vegetable prices it paid were unreasonable or that Supreme violated the process (SOF 6) for changing prices (app. mot. at 8).

The short answer to Supreme's contentions is that throughout performance Supreme had a duty to comply with the law and the contract.  For example, Supreme's employees were barred from accepting kickbacks from Barakat when Barakat was the sole supplier.  *E.g.*, *Kellogg Brown & Root Services, Inc. v. United States*, 728 F.3d 1348, 1370 (Fed. Cir. 2013).  Once Supreme brought FFC on board, its employees continued to have a duty not to accept kickbacks or to rig the bids.  And once DLA had bids from two approved suppliers, Supreme's obligation to provide DLA pricing at the most favorable terms meant that Supreme could not charge DLA nearly 20% more for avocados simply because it had a corrupt employee (SOF ¶ 14).  In other words, voluntarily bringing FFC into the contract did not give Supreme a free pass for bad conduct.

As for Supreme's contention that DLA fails to identify specific transactions in which it overpaid, this is true if we confine ourselves to the numbered paragraphs of the complaint.  But the complaint incorporates Supreme's supplemental disclosure, which gives us the big picture fact that after Mr. Vos was terminated the award percentage to Barakat dropped from 95% to 55% (SOF ¶ 12).  It also gives us the specific example of the avocados from Thailand and Mr. Vos's award to Barakat even though its price was nearly 20% higher than FFC (SOF ¶ 14).  We add that it is not

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

uncommon for the government to encounter difficulty in proving the exact damages in matters involving fraud, which does not justify dismissal of such cases. *See Continental Mgmt., Inc. v. United States*, 527 F.2d 613, 619 (Ct. Cl. 1975). Accordingly, when the complaint is read along with the incorporated supplemental disclosure, DLA has alleged more than enough to survive a motion to dismiss for failure to state a claim.

CONCLUSION

Supreme's motion is denied.

Dated: April 12, 2024

MICHAEL N. O'CONNELL
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Vice Chairman
Administrative Judge
Armed Services Board
of Contract Appeals

DOCUMENT FOR PUBLIC RELEASE
The decision issued on the date below is subject to an ASBCA Protective Order.
This version has been approved for public release.

I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 60309, Appeal of Supreme
Foodservice GmbH, rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals